**STEADFAST INSURANCE COMPANY, Plaintiff—Appellee,**

v.

**AGRICULTURAL INSURANCE COMPANY, now known as Great American Assurance Company, Defendant—Appellant.**

No. 10–5113.

United States Court of Appeals, Tenth Circuit.

March 30, 2012.

Tory M. Bishop, Kutak Rock LLP, Omaha, NE, Larry George Cassil, Jr., Hornbeek, Vitali & Braun, PLLC, Gerald P. Green, Pierce, Couch, Hendrickson, Baysinger & Green, LLP, Oklahoma City, OK, for Plaintiff–Appellee.

Murray E. Abowitz, George W. Dahnke, Sarah J. Timberlake, Abowitz, Timberlake, Dahnke & Gisinger, P.C., Oklahoma City, OK, for Defendant–Appellant.

Before HARTZ *, EBEL and HOLMES, Circuit Judges.

### CERTIFICATION OF QUESTION OF STATE LAW

DAVID M. EBEL, Circuit Judge.

Plaintiff–Appellee Steadfast Insurance Co. ("Steadfast") issued successive insur-

* Judge Hartz joins Sections I, II, and IV of this certification order.

ance policies to the Grand River Dam Authority ("GRDA"), providing GRDA with first-level excess general liability coverage from 1993 through 2002. Steadfast defended GRDA against a number of flooding claims made during this time period. Although the flooding at issue spanned the entire nine-year period of coverage, Steadfast and GRDA agreed that the amounts Steadfast paid on those claims would be allocated to a single Steadfast policy, the 1993–94 policy. Defendant–Appellant Agricultural Insurance Co. ("Agricultural") provided GRDA with second-level excess liability insurance during this same time period, which was triggered once Steadfast had reached its policy limits for a given year. In this case, Agricultural alleged that Steadfast artificially allocated all of the flooding claims it paid on GRDA's behalf to Steadfast's 1993–94 policy, wrongfully triggering Agricultural's second-level excess coverage for that year. The district court held that Agricultural did not have a viable cause of action for equitable subrogation against Steadfast under Oklahoma law because the insured, GRDA, had agreed with Steadfast to allocate its payment of the flooding claims to only the 1993–94 policy and had further agreed to release Steadfast from any further liability under that policy. Agricultural appeals that determination.

## I. QUESTION CERTIFIED

Pursuant to 10th Cir. R. 27.1 and Okla. Stat. tit. 20, § 1602, the United States Court of Appeals for the Tenth Circuit requests that the Oklahoma Supreme Court exercise its discretion to consider the following certified question of Oklahoma law which "may be determinative of an issue" presented by this appeal and on which "there is no controlling" Oklahoma law. Okla. Stat. tit. 20, § 1602.

Whether a second-level excess insurer can assert a claim for equitable subrogation against a first-level excess insurer even though the insured has agreed with the first-level excess insurer that the first-level insurer has exhausted its coverage limits and thus has released the first-level excess insurer from any further obligation under the policy?

## II. STATEMENT OF FACTS

The parties stipulated to the following facts: GRDA "is a conservation and reclamation district created pursuant to Oklahoma statute for the purpose of utilizing the waters of the Grand River and its tributaries." (Aplt.App. at 91 ¶ 1 (quotation omitted).) GRDA owns and operates the Pensacola Dam, which "impounds the waters from the Neosho (Grand) and Spring Rivers in a containment known as Grand Lake." (Id. at 92 ¶¶ 2–3.) The dam produces hydroelectric power.

Beginning in 1994, landowners upstream from the dam filed four separate lawsuits in Oklahoma state court, alleging GRDA had intentionally raised the level of water contained by the Pensacola Dam in order to increase production of electricity, knowingly causing or worsening floods that damaged these landowners' property. The state-court lawsuits, referred to as the *Wagoner, Roberts, Dalrymple* and *Allman* actions, involved claims resulting from a number of floods occurring from September 1992 through May 1999.[1] *Dalrymple* was pursued as a class action.

### A. GRDA's general liability insurance coverage

During this time period, GRDA's primary general liability insurer was the

---

1. The flooded landowners brought these four lawsuits in state court in Ottawa County, Oklahoma. *See Wagoner v. GRDA*, No. CJ-94–140; *Roberts v. GRDA*, No. CJ–94–144; *Dalrymple v. GRDA*, No. CJ–94–444; *Allman v. GRDA*, No. CJ–2001–381.

State of Oklahoma, which provided $200,000 in coverage for each insured occurrence. Steadfast then provided GRDA with first-level excess general liability insurance coverage up to $10 million, including defense costs.[2] The initial policy Steadfast issued GRDA was effective from May 16, 1993, until May 16, 1994 ("1993–94 policy"). That policy also covered "all claims from any occurrences" from May 16, 1986, through May 16, 1993, of which GRDA "had no knowledge prior to" May 16, 1993. (*Id.* at 301 (emphasis omitted).) Steadfast subsequently issued GRDA four additional policies that provided similar coverage from May 16, 1994, through May 16, 2002. "The Limits of Insurance of [each of these policies applied] separately to each consecutive annual period." (*Id.* at 280.)

Agricultural provided GRDA with a second layer of excess general liability insurance from May 16, 1993, through May 16, 1994.[3] This policy provided up to $15 million in excess liability coverage and was a "following form" policy, meaning it provided coverage on the same terms as Steadfast's first-level excess liability policy.

## B. GRDA's defense of the flooded landowners' claims

GRDA initially defended itself against the flooded landowners' claims. In 1996, after spending over $400,000 in its own defense, GRDA tendered its defense of those claims to Steadfast. Steadfast accepted defense of GRDA under Steadfast's 1993–94 policy, "subject to a reservation of rights," and disclaimed any coverage under the later Steadfast policies. Steadfast's disclaimer was based, in part, on its contention that all of the flooding claims resulted from a single decision made by GRDA in 1992 to raise the operating level of Grand Lake.

Steadfast expended approximately $1.5 million defending GRDA against the flooded landowners' claims and paid just under $122,000 to satisfy several judgments for money damages entered against GRDA. In addition, Steadfast and GRDA, through mediation, settled the claims of eighty-eight of the ninety-four remaining *Dalrymple* class members' claims.[4] Steadfast contributed over $8.3 million toward this settlement.

The settlement agreement between GRDA, Steadfast, and the eighty-eight settling *Dalrymple* plaintiffs stated that Steadfast's more than $8.3 million "payment hereunder exhausts all available policy limits provided under its 93–94 policy and, therefore, Steadfast shall not be liable under its 93–94 policy to any party for any indemnity or defense expense for any

---

**2.** Although Steadfast provided GRDA with first-level excess liability coverage, Steadfast essentially became GRDA's primary liability insurer because GRDA never sought coverage from the State of Oklahoma. It is not completely clear why GRDA never sought coverage first from Oklahoma. But GRDA's risk manager testified in his deposition that GRDA never approached Oklahoma about coverage for the flooded landowners' claims. Instead, GRDA paid the first $200,000 for defending those claims out of its own funds before seeking coverage under the Steadfast policy. Even though Steadfast essentially became GRDA's primary insurer, this order refers to Steadfast as the first-level excess insurer.

**3.** Agricultural issued GRDA subsequent excess liability policies, but those later policies are not at issue here.

**4.** The state court in the *Dalrymple* case certified a class for the determination of GRDA's liability and ultimately held that GRDA was liable for the flooding. The court then addressed the individual class members' claims separately, entering judgment for four class members. After those judgments, GRDA, with Steadfast, reached a settlement with eighty-eight of the remaining ninety-four class members' claims.

claim for any flood event that occurred on or before May 16, 1994." (*Id.* at 684.) The parties agreed to this even though, as a result of this settlement, the *Dalrymple* plaintiffs released claims against GRDA based on floods occurring from 1992 through the time of the settlement, September 2005. After this settlement, GRDA turned to its second-level excess insurer, Agricultural, which agreed, "subject to a reservation of rights," to defend GRDA against the remaining *Dalrymple* claims, as well as claims asserted in the *Wagoner, Roberts* and *Allman* actions. (*Id.* at 100 ¶¶ 38–40.)

## C. Procedural background of this litigation

While the four state-court actions against GRDA were ongoing, Steadfast sued GRDA and Agricultural in federal court, seeking a declaration that, under Oklahoma law, it had no obligation to cover any of the state-court claims being pursued against GRDA or, if Steadfast did have such an obligation, that obligation was limited to the coverage provided under Steadfast's 1993–94 policy. Agricultural filed a counterclaim against Steadfast, which is the claim at issue here. Premised on its contention that each flood was a separately insured occurrence, Agricultural alleged that Steadfast had manipulated its settlement with GRDA and the eight-eight *Dalrymple* plaintiffs to limit, artificially, Steadfast's liability to the coverage available under its 1993–94 policy. In this way, according to Agricultural, Steadfast improperly triggered the second-level excess liability coverage Agricultural provided GRDA for 1993–94.

After a trial to the court based upon stipulated facts, the district court entered judgment for Steadfast on Agricultural's counterclaim, ruling in pertinent part that Agricultural could not pursue an equitable subrogation claim against Steadfast because GRDA had previously released Steadfast from any further liability under its 1993–94 policy.

## III. SUMMARY OF LEGAL DISPUTE

Subrogation generally is "[t]he substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Black's Law Dictionary (9th ed.2009). Subrogation, then, "is a derivative concept." *U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 831 (Okla.2001).

Oklahoma law recognizes both conventional and equitable subrogation. *See Brown v. Patel,* 157 P.3d 117, 125 (Okla. 2007). "Conventional (or contractual) subrogation is created by an agreement or contract between parties granting the right to pursue reimbursement from a third party in exchange for payment of a loss." *Id.* "Equitable subrogation, on the other hand, does not depend upon a contract but arises by implication in equity to prevent an injustice." *U.S. Fid. & Guar. Co.,* 37 P.3d at 831.

> [It] is based on the relationship of the parties and equitable principles of establishing substantial justice, and it is broad enough to include every instance where one person who is not a mere volunteer, pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter.

*Id.* Thus, "[t]he doctrine of equitable subrogation is a tool to compel the ultimate discharge of an obligation by the person who in good conscience ought to pay it." *Bank of Wichitas v. Ledford,* 151 P.3d 103, 114 n. 38 (Okla.2006). "Equity," however, "cannot be invoked to change rights de-

fined and established by law, or to create a right where none exists." *Rice–Bell P'ship v. Capitol Indem. Corp.*, 8 P.3d 189, 193 (Okla.Civ.App.2000); *see also Mid–Continent Cas. Co. v. First Nat'l Bank & Trust Co.*, 531 P.2d 1370, 1375 (Okla.1975).

Oklahoma courts recognize that "[e]quitable subrogation between insurers is commonly used as a vehicle to shift defense costs between[, for example,] primary and excess insurers." [5] *U.S. Fid. & Guar. Co.*, 37 P.3d at 832; *see also Niemeyer v. U.S. Fid. & Guar. Co.*, 789 P.2d 1318, 1322 (Okla.1990) (noting that primary insurer's "duty to use the utmost good faith in the disposition of claims made against its insured" has been extended to excess insurers under a theory of equitable subrogation). Nevertheless, the district court held that, under the circumstances of this case, Agricultural could not assert such a claim against Steadfast. Relying on case law from California and Illinois, the district court reasoned that, because a subrogee's claim is derived from the subrogor, and because in this case the insured subrogor GRDA had already released Steadfast from further liability under its 1993–94 policy, Agricultural, acting as GRDA's subrogee, could not now assert a claim against Steadfast to provide further coverage under the 1993–94 policy.

Oklahoma courts have not addressed the specific circumstances presented here.

And other states addressing similar circumstances have adopted two contradictory lines of analysis. As explained in greater detail below, one line of authority precludes an excess insurer from asserting an equitable subrogation claim against the primary insurer after the insured has released that primary insurer from further liability. The second, contrary, line of authority would still permit the excess insurer to assert an equitable subrogation claim against the primary insurer under such circumstances.

**1. A subrogor's (GRDA's) release of a primary insurer (Steadfast) precludes an action against that insurer by the subrogee (Agricultural)**

The first line of authority from other states concludes that an insured's release of a primary insurer from further liability precludes the excess insurer, as the insured's subrogee, from later pursuing a subrogation claim against the primary insurer. *See Fireman's Fund Ins. Co. v. Md. Cas. Co.*, 21 Cal.App.4th 1586, 26 Cal. Rptr.2d 762, 765, 767–69 (Cal.Ct.App. 1994); *U.S. Fire Ins. Co. v. Zurich Ins. Co.*, 329 Ill.App.3d 987, 263 Ill.Dec. 528, 768 N.E.2d 288, 300 (Ill.App.Ct.2002); *cf. Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 695–98 (Tex.2000) (holding that insured's prior settlement

---

**5.** The Oklahoma Supreme Court distinguishes equitable subrogation from the separate and distinct doctrine of equitable contribution. *See U.S. Fid. & Guar. Co.*, 37 P.3d at 832. "Equitable contribution is the right to recover, not from a party primarily liable for the loss, but from a co-obligor or co-insurer who shares common liability with the party seeking contribution." *Id.* Different from equitable subrogation, equitable contribution

applies only when co-insurers have covered the same insured and the same particular risk at the same level of coverage. The right of contribution is not derivative of the

rights of the insured, but belongs to each insurer independently to seek reimbursement from a co-insurer those sums which were paid in excess of an insurer's proportionate share of the common obligation. Therefore two primary insurers will have the right of contribution from each other, but in the absence of an agreement there is generally no right of contribution between a primary and excess insurer, because they do not share a common obligation with common rights.

*Id.* Equitable contribution is not an issue in this case.

with its attorneys releasing them from some malpractice claims precluded portions of the malpractice claims asserted against the attorneys by primary and excess insurers, as insured's equitable subrogees). These cases reason as follows:

> The right of subrogation is purely derivative. An insurer entitled to subrogation is in the same position as an assignee of the insured's claim, and succeeds only to the rights of the insured. The subrogated insurer is said to "stand in the shoes" of its insured, because it has no greater rights than the insured and is subject to the same defenses assertable against the insured. Thus, an insurer cannot acquire by subrogation anything to which the insured has no rights, and may claim no rights which the insured does not have.

*Fireman's Fund Ins. Co. v. Md. Cas. Co.,* 65 Cal.App.4th 1279, 77 Cal.Rptr.2d 296, 303 (Cal.Ct.App.1998) (internal quotation marks omitted). Based upon this reasoning, California law, in particular, requires a party seeking to assert an equitable subrogation claim to prove, as an element of the claim, that the subrogor "has an existing, assignable cause of action against the defendant which the [subrogor] could have asserted for its own benefit had it not been compensated for its loss" by the subrogee. *Id.*

The district court in the present case, relying on this line of reasoning, held that Agricultural, as GRDA's subrogee, could not assert an equitable subrogation claim against Steadfast based upon Steadfast's 1993–94 policy, because GRDA, the insured, had already released Steadfast from any further obligation under that policy. Agricultural argues, however, that Oklahoma would not adopt such reasoning. In support of that argument, Agricultural asserts that, contrary to this line of authority from California and Illinois, Oklahoma courts in other contexts permit a subrogee to pursue a claim even though the subrogor from whom the claim is derived could itself have no longer pursued that claim.

As one example, Agricultural points to *Republic Underwriters Insurance Co. v. Fire Insurance Exchange,* 655 P.2d 544 (Okla.1983). In *Republic Underwriters,* the insureds' residence was destroyed by fire. *Id.* at 545. At the time, the insureds were covered by two fire insurance policies, one issued by Republic Underwriters and the other issued by Fire Insurance Exchange ("Fire Insurance"). *Id.* When Fire Insurance refused to pay the insureds' claim, Republic paid the entire amount of the loss and then sued Fire Insurance for reimbursement under an equitable subrogation theory.[6] *Id.* The Oklahoma Supreme Court held that, although the insureds' own claim under the policies was barred by a one-year limitations period required by law to be included in the policies, Republic's equitable subrogation claim against Fire Insurance was subject, instead, to a longer limitations period applicable to implied-in-law contracts and was, therefore, timely. *Id.* at 545–46. Thus, in *Republic Underwriters,* the equitable subrogee was able to assert a claim that its subrogor, the insureds, no longer could.[7]

---

**6.** Although *Republic Underwriters* involved two primary insurers, it "correctly" applied principles of equitable subrogation, rather than equitable contribution, because the two primary insurers in that case had issued policies that "contained pro rata clauses—provisions which limited the liability of insurers to that proportion of the loss as their share of

insurance bears to the total coverage." *U.S. Fid. & Guar. Co.,* 37 P.3d at 835. Thus, the insurers did "not have a common and concurrent obligation," but instead owed the insureds independent and several obligations. *Id.*

**7.** *Employers Mutual Casualty Co. v. Mosby,* 943 P.2d 593 (Okla.1997), seemingly conflicts

As another example of a circumstance when the Oklahoma Supreme Court permits a subrogee to assert a claim, even though the subrogor could no longer assert that same claim, Agricultural points to several cases involving forged mortgages. Those cases involved banks lending money based upon forged mortgages and homeowners using the proceeds of those loans to pay off earlier mortgages on the same property. In such situations, Oklahoma courts have treated the bank that lent money on the forged mortgage to be subrogated to claims that the previous lender had against the homeowner, even though that previous lender had already been paid in full and its claims against the homeowner thus already released. *See Equitable Life Assurance Soc'y v. McFadden,* 181 Okla. 162, 72 P.2d 795, 796–98 (1937); *Deutsche Bank Nat'l Trust Co. v. Roberts,* 233 P.3d 805, 806–09 (Okla.Civ.App.2010).

As a final example of when Oklahoma courts permit a subrogee to assert a claim that the subrogor could not, Agricultural points to *Lawyers' Title Guaranty Fund v. Sanders,* 571 P.2d 454 (Okla.1977) (per curiam). There, buyers hired an attorney to provide a title opinion before they purchased real estate. *Id.* at 455. After buying the property, buyers discovered an undisclosed lien on the property, which their attorney had failed to discover. *Id.* Instead of suing the sellers, as they could have, the buyers sued their attorney for malpractice. *Id.* The lawyer's malpractice insurers paid the buyers' claim and then sued the sellers for breaching the deed's warranty of title. *Id.* Under those

circumstances, the Oklahoma Supreme Court rejected the argument that an insurer could only be the equitable subrogee of its own insured and held, instead, that the malpractice insurers in that case could be equitably subrogated to the buyers' right of action against the sellers. *Id.* at 456.

## 2. A subrogor's (GRDA's) release of its primary insurer (Steadfast) from liability does not preclude the subrogee's (Agricultural) equitable subrogation claim against the primary insurer

There is another line of authority that, contrary to the Illinois and California cases relied upon by the district court, concludes that an insured's release of its primary insurer will *not* preclude an excess insurer's subrogated claim against the primary insurer. In *Sharon Steel Corp. v. Aetna Casualty & Surety Co.,* 931 P.2d 127 (Utah 1997), for example, the Utah Supreme Court, in addressing generally analogous circumstances, held "that an insurer who is on notice that another insurer has been paying significant defense costs should not be allowed to settle [with the insured] for a minimal sum [in order] to avoid having to contribute its fair share" toward the insured's defense. *Id.* at 139. In reaching this conclusion, the Utah court noted that there is "an incentive for an insurer to engage in 'sharp practices' to settle for a limited amount with the possibly unsophisticated insured to avoid the subrogation rights of another insurer who

with *Republic Underwriters.* In *Mosby,* the Oklahoma Supreme Court, in a different context, held that, where an insured's claim against a tortfeasor, for injuries resulting from an auto accident, was barred by the statute of limitations applicable to negligence, so, too, was the equitable subrogee's assertion of that same claim. *Id.* at 594–95. "A subro-

gee steps into the shoes of the [subrogor] subject to all legal and equitable defenses which the tortfeasor may have against the [subrogor.] A subrogee acquires no rights greater than those of the party whose claim it has paid." *Id.* at 595 (internal quotation marks, citation, alteration omitted).

690

has paid substantial defense costs."[8] *Id.*

Agricultural relies on this reasoning to argue that Oklahoma law would apply equitable subrogation broadly enough to permit a subrogee to assert a claim that its subrogor has already released. And, in an unreported case, the Northern District of Oklahoma appears to have permitted an insurer to pursue an equitable subrogation claim against another insurer, notwithstanding that the second insurer had previously obtained a release from the insured. *See Fed. Ins. Co. v. Sw. Wire Cloth, Inc.,* No. 95–C–689–K, 1999 WL 33544427, at *3, *5 (N.D.Okla. Feb.8, 1999) (unreported).

## IV. PROCEDURAL ORDERS IMPLEMENTING CERTIFICATION

We appreciate the Oklahoma Supreme Court's consideration of our certified question. And we recognize that, if the Oklahoma Supreme Court accepts this certified question, it may, "[p]ursuant to Okla. Stat. tit. 20, §§ 1602.1 and 1604(A)(3), . . . reformulate this question of law." *Pino v. United States,* 507 F.3d 1233, 1238 (10th Cir.2007). To facilitate the certification process, we direct the following:

> The clerk of this court [shall] transmit a copy of this certification order to the parties and [ ] forward a copy of this order, together with the parties' briefs (which also display the names and addresses of counsel of record, see Okla. Stat. tit. 20, § 1604(A)(4)), to the Oklahoma Supreme Court pursuant to Okla. Stat. tit. 20, § 1603.1.

*Pino,* 507 F.3d at 1238. We also direct the clerk of this court to transmit a copy of this certification order to the Clerk of the

United States District Court for the Northern District of Oklahoma, attention case No. 4:05:–CV–00126–GKF–TLW. *See Ball v. Wilshire Ins. Co.,* 498 F.3d 1084, 1086 (10th Cir.2007). "The treatment of any costs associated with the certification proceedings should be as prescribed by Okla. Stat. tit. 20, § 1606." *Randall v. Travelers Cas. & Sur. Co.,* 450 F.3d 1115, 1117 (10th Cir.2006).

Pursuant to Tenth Circuit Rule 27.1(A)(2), we stay this appeal pending the Oklahoma Supreme Court's consideration of this certification request and, if the request is accepted, pending the Oklahoma Supreme Court's resolution of the certified question. *See Randall,* 450 F.3d at 1117. If the Oklahoma Supreme Court accepts our certified question, the parties are directed to notify this court when the Oklahoma Supreme Court enters a final order resolving this question.

---

8. In *Sharon Steel,* the Utah Supreme Court used the term contribution interchangeably with subrogation, *see* 931 P.2d at 136–39, in addressing circumstances that, under Oklahoma law, would have presented a claim for equitable contribution between equal insurers, *see U.S. Fid. & Guar. Co.,* 37 P.3d at 832.